## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

WEST AMERICAN INSURANCE COMPANY
and PEERLESS INDEMNITY INSURANCE
COMPANY,

          Plaintiffs,

v.　　　　　　　　　　　　　　　　　　　　　　　**No: 1:17-cv-01047-RB-LF**

HAILEY ATYANI, *et al.*,

          Defendants,

and

DENNIS BONFANTINE, JANICE BONFANTINE,
D.B. KELLY, INC., d/b/a KELLY'S BREW PUB
AND RESTAURANT and DB BREWERY LLC,

          Defendants/Counter-Claimants,

v.

WEST AMERICAN INSURANCE COMPANY
and PEERLESS INDEMNITY INSURANCE
COMPANY,

          Counter-Defendants.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Dennis Bonfantine, Janice Bonfantine, D.B. Kelly, Inc., d/b/a Kelly's Brew Pub and Restaurant and DB Brewery LLC's (collectively, "the Kelly's Defendants") Motion for Partial Summary Judgment (Doc. 53), and Plaintiffs West American Insurance Company and Peerless Indemnity Insurance Company's (collectively, "the Insurers") Motion for Summary Judgment (Doc. 74). Together, the motions seek summary judgment for all claims contained in the Insurers' Complaint for Declaratory Judgment (Doc. 1) and the Kelly's Defendants' Counterclaim (Doc. 50).[1] The parties dispute whether several

---

[1] The Kelly's Defendants filed their original Answer and Counterclaim on January 17, 2018 (Doc. 13), and subsequently filed an amended version (Doc. 50) to include a specific reference to the statutory basis for their claims

insurance policies require the Insurers to defend and indemnify the Kelly's Defendants in state court actions where it is alleged that they improperly withheld tips, underpaid servers at Kelly's Brew Pub, and violated the City of Albuquerque Minimum Wage Ordinance (MWO). The Insurers seek a declaratory judgment that they are not obligated to defend nor indemnify the Kelly's Defendants in the underlying lawsuits. The Kelly's Defendants argue that the Insurers have a duty to defend the underlying actions and thus have breached their contract, acted in bad faith, and violated the New Mexico Unfair Insurance Practices Act (UIPA) by refusing to defend the claims.

## I.      Background

### A.  The Underlying State Lawsuits

In April 2016, former employees of Kelly's Brew Pub brought suit in state court, alleging that the Kelly's Defendants had been violating the MWO by withholding or requiring servers to pay back their earned tips, not paying servers the correct minimum wage, and failing to keep required payroll records. (*See* Doc. 1 ¶¶ 37, 39–45.) That case—*Atyani v. Bonfantine*—is currently pending in the Second Judicial District Court, Bernalillo County, New Mexico. *See* D-202-CV-2016-02775. In February 2017, a different former employee filed suit against the Kelly's Defendants alleging similar violations of the MWO. *See Frank v. Bonfantine*, D-202-CV-2017-00852. In November 2017, the *Frank* case was resolved through settlement and the state court dismissed *Frank* with prejudice. *Id.*, Stipulated Order Gr. Dismissal with Prejudice (2nd Jud. Dist., Bernalillo Cty., N.M. Nov. 13, 2017). (*See also* Docs. 1 ¶¶ 47–49; 53 at 7.)

The Insurers issued various insurance policies to DB Brewery LLC d/b/a Kelly's Brew Pub, and the policies were in effect during the period when the alleged MWO violations occurred.

---

for attorney's fees. (*See* Doc. 47 at 2.) The Court will thus cite the amended document (Doc. 50) as the operative Counterclaim.

(*See* Doc. 1 ¶¶ 32–34.) The relevant portions of both the Peerless and West policies include identical language covering property damage if the damage "is caused by an 'occurrence' that takes place in the 'coverage territory.'" (*Id.* ¶ 36.) The policies specifically exclude property damage that is "expected or intended from the standpoint of the insured." (*Id.*) The policies define an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*) "Property damage" is defined to include "[l]oss of use of tangible property that is not physically injured." (*Id.*; Doc. 53 at 4–5.)

The Kelly's Defendants informed the Insurers of the suits and sought defense on the theory that the claims in *Frank* and *Atyani* allege "property damage" covered by the policies. (Doc. 1 ¶ 51; Docs. 50 ¶ 51; 50-1, Ex. A.) The Insurers twice declined to defend the underlying actions on the basis that allegations of wage withholding and other MWO violations do not involve property damage resulting from an occurrence and, even if they did, would be further excluded from policy coverage as intended or expected harms. (*See* Docs. 1 ¶ 52; 53 at 8–10.) In July 2017, the Kelly's Defendants again demanded that the Insurers defend them in the *Atyani* suit. (Doc. 50-1 at 1–17.)

### B. The Insurers' Complaint for Declaratory Relief

On October 18, 2017, the Insurers filed a Complaint for Declaratory Judgment Relief seeking a ruling from this Court declaring the parties' rights and obligations under the policies. (Doc. 1.) The Complaint specifically urges the Court to find that the Insurers have no duty to defend nor indemnify the Kelly's Defendants in the underlying suits because the relevant insurance policies do not cover the claims asserted in *Frank* and *Atyani*.[2] (*Id.* at 13–14.) The Kelly's Defendants moved to dismiss the declaratory action, arguing that the Court should decline to issue

---

[2] Though *Frank* has already been resolved through settlement, the Insurers still seek a declaratory judgment that they are not obligated to reimburse the Kelly's Defendants for any defense and indemnity costs involved in the settlement. (*See* Doc. 1 ¶ 50.)

a declaratory judgment on coverage until the ongoing state case has more fully developed the facts in dispute—e.g., whether the alleged tip withholding occurred at all or occurred intentionally. (*See* Doc. 15 at 4–5.) The Court disagreed, holding that "federal declaratory relief is the most efficient and logical way to settle the present coverage dispute and will not conflict with any subsequent fact development in the underlying *Atyani* case." (Doc. 73 at 9.)

### C.  The Kelly's Defendants' Counterclaim

In answering the Insurers' complaint for declaratory judgment, the Kelly's Defendants also filed a counterclaim alleging that the Insurers: (1) breached their contract by declining to defend and indemnify the Kelly's Defendants in the underlying suits; (2) acted in bad faith by failing to adequately investigate the underlying suits and ultimately declining to defend them; and (3) violated the UIPA by, among other things, failing to promptly respond to communications and provide a reasonable explanation for refusing to defend the claims. (Doc. 50 at 17–21.)

### D.  Cross-Motions for Summary Judgment

Both parties have moved for summary judgment on the question of whether the Insurers have a duty to defend the Kelly's Defendants in the underlying suits. (Docs. 53; 74.) The Kelly's Defendants also moved for partial summary judgment on Count I of their Counterclaim, urging the Court to find as a matter of law that the Insurers breached their contract by refusing to defend the underlying suits.[3] (Doc. 53 at 2, 20.) However, the Kelly's Defendants assert that the issue of indemnity should not be decided until the underlying actions have resolved. (*Id.* at 20–22.) The Insurers seek summary judgment in their favor as to all counts of the Counterclaim, on the theory

---

[3] As the Kelly's Defendants' Partial Motion for Summary Judgment mentions only Count I of their Counterclaim (breach of contract) and makes no mention of Counts II and III (bad faith and violation of the UIPA), the Court assumes that they seek summary judgment only as to Count I. (*See* Doc. 53 at 2, 20.)

that they have no duty to defend and thus could not have breached their contractual duty, acted in bad faith, or violated the UIPA in declining to do so. (Doc. 74 at 21–25.)

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial responsibility of showing "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted).

## II.     The Duty to Defend

The question at the heart of these motions is whether the Insurers had a duty to defend the Kelly's Defendants in the underlying lawsuits. In New Mexico, the duty to defend is distinct from the duty to indemnify. *See Found. Reserve Ins. Co. v. Mullenix*, 642 P.2d 604, 605 (N.M. 1982) ("[t]his jurisdiction recognizes the distinction between an insurer's duty to defend under the terms of an insurance policy and the duty to pay under the terms of the same policy" (citing *Am. Emp'rs' Ins. Co. v. Cont'l Cas. Co.*, 512 P.2d 674 (N.M. 1973)). The duty to defend is broader than the duty to indemnify and may exist "even if [an insurer] can show in [a] collateral proceeding that it has no duty to pay under the terms of the policy." *Id.*

An insurer's duty to defend "is a matter of contract law and must be determined by the terms of the insurance policy[,]" *Miller v. Triad Adoption & Counseling Servs., Inc.*, 65 P.3d 1099, 1102 (N.M. Ct. App. 2003), by "comparing the factual allegations in the complaint with the insurance policy." *Lopez v. N.M. Pub. Sch. Ins. Auth.*, 870 P.2d 745, 747 (N.M. 1994). "In New Mexico, a court considering a collateral action will hold that the insurer has a duty to defend unless the insurer shows as a matter of law that all claims arise from the injury excluded by the insurance policy." *Union Ins. Co. v. Bandido Hideout, Inc.*, No. 11-CV-351 MCA/LFG, 2012 WL 13076230, at \*5 (D.N.M. Sept. 28, 2012) (citing *Lopez*, 870 P.2d at 748–49). Thus, the insurer bears the burden of proving that there is no duty to defend, and "any doubt about whether the allegations are within policy coverage is resolved in the insured's favor." *State Farm Fire & Cas. Co. v. Price*, 684 P.2d 524, 528 (N.M. Ct. App. 1984), *overruled on other grounds by Ellington v. N.N. Inv'rs Life Ins. Co.*, 805 P.2d 70 (N.M. 1991). "If the allegations on the face of the complaint are 'potentially' or 'arguably' within the scope of coverage, the insurer is obligated to defend." *Servants of Paraclete, Inc. v. Great Am. Ins. Co.*, 857 F. Supp. 822, 829 (D.N.M. 1994); *see also Dove v. State Farm Fire & Cas. Co.*, 399 P.3d 400, 404 (N.M. Ct. App. 2017). "The duty of an insurer to defend arises from the allegations on the face of the complaint or from the known but unpleaded factual basis of the claim that brings it arguably within the scope of coverage." *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 799 P.2d 1113, 1116 (N.M. 1990).

Whether the Insurers have a duty to defend the Kelly's Defendants in the underlying suits hinges on three distinct questions: (1) whether loss of earned cash tips could potentially constitute "property damage" under the policies; (2) if so, whether the property damage was potentially caused by an "occurrence"; and (3) if so, whether any policy exclusions clearly prevent the complaints from falling within the scope of coverage. Having reviewed both parties' motions for

summary judgment on the issue of the Insurers' duty to defend, the Court finds that there are no material facts in dispute[4] and this issue is properly resolved through summary judgment.

The Court finds that while the underlying complaints allege at least some facts that arguably show "property damage" resulting from an "occurrence" sufficient to obligate the Insurers to defend the lawsuits, the alleged harm was the type of result intended or expected by the Kelly's Defendants in crafting their tip policy, and is thus clearly outside the scope of coverage per the provision excluding "expected or intended injury." Thus, the Insurers properly declined to defend the underlying actions.

### A. The underlying actions potentially allege "property damage" as defined in the policies.

The policies define "property damage" as "[l]oss of use of tangible property that is not physically injured." (Docs. 1 ¶ 36; 53 at 4–5.) Though the Insurers believe that addressing the issue of whether there was potential "property damage" in the underlying suits "puts the proverbial cart before the horse" (Doc. 58 at 13), the Court finds that it makes more sense to determine at the outset whether the underlying complaints allege a type of injury that could be covered by the insurance policies at all. The Kelly's Defendants argue that the underlying suits allege "the loss of tangible property, i.e., tips in the form of cash, as a result of the Kelly's Defendants' alleged conduct." (Doc. 53 at 13.) They point out that "numerous courts" in various jurisdictions have held

---

[4] The parties dispute various facts presented in the cross-motions for summary judgment, but the Court finds that none of these "disputes" are genuine disputes over material issues of fact that would be necessary to resolve the duty to defend issue. (*See, e.g.*, Docs. 58 ¶¶ 5, 12; 78 ¶ 3 (both parties disputing incomplete quotations from the insurance policies); Doc. 58 ¶ 18 (the Insurers disputing the Kelly's Defendants' use of the term "money" when the underlying complaint does not use the exact term "money"); *id.* ¶¶ 27–28 (the Insurers disputing facts because they are "irrelevant and immaterial"); Doc. 78 ¶ 5 (the Kelly's Defendants disputing characterization of the number of putative class members).) Each of the parties' purported "disputes" are either not factual disputes or do not relate to facts that are material in determining whether the Insurers have a duty to defend the underlying lawsuits.

Similarly, the Kelly's Defendants' supplementation of the record with selected deposition transcripts discussing the Insurers' claims adjusters' opinions as to the definition of various disputed terms is unavailing on this issue, as lay witnesses' opinions about New Mexico law are not relevant to resolving this purely legal question. (*See* Doc. 77.)

that cash may be considered tangible property subject to "property damage" under commercial insurance policies, and that New Mexico courts have considered cash to be "tangible property" in other, non-insurance contexts. (*Id.* at 13–15.)

The Insurers, on the other hand, argue that courts that have addressed "the question directly—i.e., are employees' tips considered tangible property—have answered it in the negative." (Doc. 58 at 13.) They emphasize that New Mexico courts have not considered cash tips to be tangible property "except in the very limited, inapplicable, context of the statutory construction of New Mexico's garnishment statute." (*Id.* at 14.) The Insurers cite alternative definitions of tangible property as "corporeal" and "[t]hat which may be felt or touched" (*id.*), and point to examples of courts in other jurisdictions holding that salaries and economic interests do not constitute tangible property. (*Id.* at 14–17 (gathering cases).) The Insurers also argue that the MWO itself defines tips as a "***sum*** presented by a customer as a gift or gratuity," and that the underlying lawsuits seek the return of those *sums* that were allegedly withheld, not the return of the actual cash and coins given to them by customers. (*Id.* at 15.)

The parties' plentiful citations to persuasive caselaw on both sides of the issue suggest from the start that the issue is not clearly settled under New Mexico law and that cash tips do not clearly fall outside the definition of "tangible property" such that loss of cash tips could never be covered under the policies. Indeed, the Insurers essentially concede the point by stating that "[c]ases relied upon by Defendants may be viewed for the proposition that cash in the form of actual currency ***may, in certain circumstances,*** constitute tangible property under an insurance policy." (*Id.* at 19.) Though the Insurers make a strong argument that the tips in the underlying cases are not "tangible property" for insurance purposes, their concession that they *may* be treated

as such in certain circumstances makes clear that, on this issue, the underlying complaints might "arguably" or "possibly" fall under the scope of policy coverage for "property damage."

The Second Amended Complaint in *Atyani*,[5] for example, contains various factual and legal allegations that could fall under the scope of coverage if there is any possibility that the state court would consider cash tips tangible property. (*See, e.g.*, Doc. 1-6 ¶ 69 (under "Defendants' 'tip out' requirement . . . servers sometimes owed more in cash at the end of their shifts than they actually earned in cash tips. When this happened, Defendants required [them] to pay the difference from their wallets, or took the difference out of their paychecks"); *id.* ¶ 74 ("tips [servers] earned were their property"); *id.* ¶ 115 ("Defendants have unlawfully exercised dominion and control over their property, specifically tips provided them by customers").)

Though not every count or allegation in the underlying complaints involves the taking of physical cash tips, at least some do, and until the Insurers can prove "to the satisfaction of the federal trial court that all claims arose from [an act not covered by the policies] . . . [they are] under a duty to defend . . . ." *See Lopez*, 870 P.2d at 749. Some of the counts in *Atyani* and *Frank* involve alleged unlawful taking and misappropriating of physical *cash tips*, even though the majority of the claims do not reference cash and many of the tips were given through credit cards.[6] (*See* Docs. 1-6 at 10–14; 1-7 at 2.) The fact that at least some of the alleged injuries include loss of cash, combined with the genuine debate over whether cash tips constitute "tangible property," mean that this prong of the analysis leans toward the Insurers having a duty to defend the underlying suits.

---

[5] Each complaint in *Atyani* is substantially the same in terms of the allegations that would trigger coverage (*see* Doc. 50-1 at 18–56, 73–93), so the Court will cite to the currently operative Second Amended Complaint (Doc. 1-6).

[6] The *Frank* complaint alleges that the Kelly's Defendants unlawfully retained tips servers turned over to them for purposes of a tip pool, rather than paying the pooled funds back to tipped employees. (*See* Doc. 1-7 at 2.) For purposes of this analysis, the Court will assume that at least some of these tips were given to servers in the form of cash.

**B. The potential "property damage" arguably resulted from an "occurrence" as defined in the policies.**

The Insurers argue that, even if cash tips could potentially be considered tangible property, the underlying state lawsuits do not allege an "occurrence" that would bring them under the policies. (*See* Doc. 74 at 4.) The policies cover property damage "only if . . . [the] 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory[.]'" (Doc. 1 ¶ 36). "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*; Doc. 53 at 4–5.) The Insurers argue that, because "accident" is not defined under the policies, it should be "interpreted in its usual, ordinary[,] and popular sense." (Doc. 74 at 12 (quoting *Battishill v. Farmers All. Ins. Co.*, 127 P.3d 1111, 1113 (N.M. 2006).) The Insurers cite the New Mexico Supreme Court's holding in *O'Rourke v. New Amsterdam Casualty Co.*, that accident "denotes an unlooked-for mishap, or an untoward event which is not expected or designed." 362 P.2d 790, 792 (N.M. 1961) (internal quotation marks and citations omitted). According to the Insurers, because the Kelly's Defendants affirmatively designed and implemented the policy by which tips were allegedly misappropriated, the alleged harm was not the result of an accident in any ordinary sense of the word. (*See* Doc. 74 at 13.)

The Kelly's Defendants argue that the definition of "accident" is actually much broader, as the New Mexico Court of Appeals recognized in holding that faulty workmanship may be considered an accident constituting an "occurrence" in the insurance context. (*See* Doc. 53 at 15 (citing *Pulte Homes of N.M., Inc. v. Ind. Lumbermens Ins. Co.*, 367 P.3d 869 (N.M. Ct. App. 2016)).) Further, they point out that the term "accident" is undefined and ambiguous in the policy, and thus should be construed against the Insurers when considering a duty to defend. (Doc. 61 at 4.) The Kelly's Defendants assert that the MWO can certainly be violated by accident. (Doc. 78 at 13.) They argue that "the ordinary usage of 'accident' does not exclude intentional **acts**; it can

include unexpected results, caused by carelessness or ignorance, of intentional acts." (*Id.* at 14.) For example, the Kelly's Defendants argue, the *Pulte Homes* court found that the workmanship in that case "was not unintended; it was just bad[, which] was enough to allege an accident, and therefore an occurrence." (*Id.* at 15 (discussing *Pulte Homes*, 367 P.3d at 878).)

The Court finds that, like the question of whether cash tips could be considered "tangible property," whether the harms alleged as a result of the Kelly's Defendants' tip policy could arguably derive from an "accident" and thus an "occurrence" is debatable enough under New Mexico law to create a duty to defend in the underlying actions. The term "accident" in the policies appears to be ambiguous both in its general scope and "as-applied" in this case. *See Dove*, 399 P.3d at 407 ("[e]ven if an ambiguity is not apparent on its face, an ambiguity can arise when otherwise clear policy language appears ambiguous upon application to a particular circumstance" (quoting *Apodaca v. Farmers Ins. Co. of Ariz.*, 75 P.3d 404, 407 (N.M. Ct. App. 2003)). Does an accident occur only if the event itself is unforeseen? Or if the harmful results of that event are unforeseen? Could a harmful tip retention policy constitute an accident because it creates "continuous or repeated exposure to substantially the same general harmful conditions"?

New Mexico caselaw does not definitively settle the issue, as made clear by both parties' competing citations to cases discussing various definitions of "accident." *Compare O'Rourke*, 362 P.2d at 792 ("accident . . . denotes an unlooked-for mishap, or an untoward event which is not expected or designed"), *with United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 652 ("[w]hile 'accidental' may be defined as 'unexpected,' *see* Black's Law Dictionary, . . . it has just as plausibly been defined as 'occurring unintentionally,' *see* The American Heritage Dictionary of the English Language 11 (4th ed. 2000)"). *See also Pulte Homes*, 367 P.3d at 878 ("fortuity is not

the sole prerequisite to finding an accident under a [commercial general liability] policy") (citing *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1285 (10th Cir. 2011)).

Thus, it is far from clear that the definitions of "occurrence" and "accident" exclude the harmful effects of a tip policy, even when that policy itself was implemented intentionally. The Court finds that "[t]he absence of a definition of the term in the Policies, taken together with diverging definitions in standard dictionaries and the lack of any consensus among courts nationwide" leads to the conclusion that the term "accident" is ambiguous in this case. *See United Nuclear Corp.*, 285 P.3d at 656. Thus, this prong of the inquiry also leans toward a finding that the Insurers have a duty to defend the Kelly's Defendants in the underlying suits based on claims of lost cash tips as potential "property damage" caused by an "occurrence."

### C. The alleged "property damage" was intended or expected from the standpoint of the Kelly's Defendants, and thus falls clearly outside policy coverage.

However, though the complaints in the underlying suits arguably allege harms that would be covered by the Insurers' policies based on "property damage" resulting from an "occurrence," New Mexico law is clear that the "expected or intended injury" policy exclusion removes the underlying claims from coverage. The policies include an exclusionary provision that states: "This insurance does not apply to . . . 'property damage' expected or intended from the standpoint of the insured." (Doc. 1 ¶ 36.) The Insurers argue that this exclusion applies to the claims in the underlying lawsuits because "the injuries that the underlying plaintiffs allege are of the same general type that may be expected to result from Defendants' tip policy, including the taking of tips of their employees." (Doc. 74 at 20.)

The Kelly's Defendants counter that the exclusion does not relieve the Insurers of their duty to defend because "[n]one of the state court claims requires proof that the Kelly's Defendants expected or intended the loss." (Doc. 53 at 16.) Because the underlying actions do not allege

violations of the law that require intent to harm or interfere with the rights of others, the Kelly's Defendants conclude that the exclusion for intended or expected harm does not preclude the Insurers from defending the suits. (*Id.* at 16–18.) In addition, the Kelly's Defendants assert that "facts outside of the underlying state court complaints[] suggest that the intentional acts exclusions should not apply because of a lack of evidence of intent." (*Id.* at 17.) They argue that there is no evidence that the Kelly's Defendants actually kept or intended to keep any of the allegedly misappropriated tips. (*Id.*)

The Kelly's Defendants are correct that exclusionary provisions in the insurance context "must be narrowly construed." (*Id.* at 16 (citing *Knowles v. United Servs. Auto. Ass'n*, 832 P.2d 394, 396 (N.M. 1992)).) However, unlike the inconsistent and unclear caselaw surrounding interpretation of "property damage" and "occurrence," the New Mexico Supreme Court has provided clear guidance for interpreting exclusionary clauses in the insurance context. *See Knowles*, 832 P.2d at 398 (governing the interpretation of "expected or intended injury" provisions); *Lopez*, 870 P.2d at 747 (explaining that the applicability of an exclusionary clause is based on the origin of alleged damages rather than the legal theory of recovery).

In *Knowles*, the court was required to interpret a similar "expected or intended injury" exclusionary provision in an insurance policy and found that such provisions "should be construed to exclude harm of the same general type as intended by the insured." 832 P.2d at 398. In that case, the insured had purchased a general personal liability policy that excluded coverage "for injury that was expected or intended by the [insured]." *Id.* at 395 (internal quotation marks omitted). When the insured "placed a locked gate across a road on [his] property[,]" the gate interfered with his neighbor's use of an easement on that property. *Id.* The neighbor brought suit for wrongful

eviction and the insured sought defense from his insurance company. *Id.* The insurance company disclaimed a duty to defend, relying on the "expected or intended" injury exclusion. *Id.*

The court undertook a survey of various approaches to interpreting "expected or intended injury" exclusions in other jurisdictions. *Id.* at 397. The court summarized the three main approaches jurisdictions have adopted in interpreting such clauses: (1) the clause only excludes coverage when the insured "acted with specific intent to cause the damage"; (2) the clause excludes coverage for injuries that are "the natural and probable consequence of the intentional act"; and (3) the clause excludes coverage for "harm of the same general type as the insured intended." *Id.* (citing *United Servs. Auto. Ass'n v. Elitzky*, 517 A.2d 982 (Pa. Sup. Ct. 1986)). The New Mexico Supreme Court expressly adopted the third approach, holding that the clause "should be construed to exclude harm of the same general type as intended by the insured." *See id.* at 398. "We adopt this approach because we believe that it is consistent with the rationales of our prior cases and it affords maximum coverage to insured persons, . . . thereby giving effect to the reasonable expectations of the insured." *Id.* (internal quotation marks and citation omitted).

After adopting this approach, the court then found that when the insured placed the locked gate across the road he "intended or expected harm of the same general type as was alleged by the [underlying] complaint." *Id.* "While the [insured] may not have intended or expected to cause any harm to [his neighbor], he desired to limit access to the road. Thus, the harm alleged in [the neighbor's] complaint was of the same general type as that expected or intended" by the insured and the exclusion precluded coverage for the neighbor's claim.[7] *Id.* In *Knowles*, the New Mexico Supreme Court clearly adopted an interpretation of expected or intended injury provisions that

---

[7] The court went on to hold, however, that because the policy also explicitly *included* coverage for wrongful eviction claims, the wrongful eviction coverage and the "expected or intended injury" exclusion "irreconcilably conflict[ed,]" and thus the exclusionary clause was ineffective. *See Knowles*, 832 P.2d at 398–99. Here, the policies include no such irreconcilable provisions that would render the exclusionary provision ineffective.

excludes harm "of the same general type as the insured intended[,]" even though the insured "*may not have intended or expected to cause any harm . . . .*" *Id.* at 397–98 (emphasis added).

Here, even if the Kelly's Defendants did not actually intend or expect to cause any harm to the servers, the allegations contained in the underlying complaints show that they intended to implement a tip system which required servers to pay them a set percentage of their earnings following each shift, including cash tips. (*See* Doc. 1-6 at 10 ("Defendants required Plaintiffs and other similarly situated servers to 'tip out' . . . 2% of total sales, plus $3.00 an hour for each work hour recorded in Defendants' timekeeping system"); *id.* at 11 ("servers sometimes owed more in cash at the end of their shifts than they actually earned in cash tips" and were then sometimes required "to pay the difference from their wallets"). The harm alleged in the underlying complaints is that the tips were the servers' property and the Kelly's Defendants unlawfully took at least some of those cash tips from the servers. (*See id.* at 17–20.)

As the underlying *Atyani* case develops, the facts may indeed show, as the Kelly's Defendants argue, that the required "tip out" procedure was lawful and thus the servers were not harmed. Or, the underlying case could reveal that the Kelly's Defendants did not understand the MWO and, even if they were violating its terms, did not specifically intend to harm the servers by collecting their cash tips. Nevertheless, the Kelly's Defendants admit frequently in their briefings that the underlying allegations are based on the policy of collecting cash from servers. (*See, e.g.*, Doc. 53 at 6 ("[t]he *Atyani* plaintiffs allege that the Kelly's Defendants took possession of money from the *Atyani* plaintiffs that rightfully belonged to them"); *id.* at 15 ("[t]he allegations of loss of cash in the *Atyani* and *Frank* lawsuits is thus subject to Plaintiffs' duty to defend").) Each of the allegations of the physical taking of cash tips that might "arguably" bring the underlying complaints within the policy coverage and trigger the Insurers' duty to defend is based on the

Kelly's Defendants' intentional practice of requiring their servers to pay them a certain percentage of their earnings, sometimes in cash, at the end of each shift.

Like in *Knowles*, though the Kelly's Defendants "may not have intended or expected to cause any harm to [the servers]," the underlying allegations are still based on their actions taken with the intent and desire to collect cash from their servers via the "tip-out" policy. *See Knowles*, 832 P.2d at 398. The harm that the servers allege in the underlying complaint—that their earned tips were taken from them by the Kelly's Defendants—is an outcome of the same general type that the Kelly's Defendants intended when crafting and implementing a policy that required servers to pay them 2% of total sales plus $3.00 per hour worked at the end of every shift.

The Kelly's Defendants claim that the expected or intended harm exclusion does not relieve the Insurers of their obligation to defend because "[n]one of the state court claims requires proof that the Kelly's Defendants expected or intended the loss." (Doc. 53 at 16.) They go on to list the specific legal claims in the underlying suits—conversion, violations of the MWO, and unjust enrichment—and explain that none of the elements of those legal claims contain intent requirements. (*Id.* at 16–17.) The New Mexico Supreme Court confused this issue somewhat in *Knowles* by suggesting that the underlying elements of the legal claim in that case—an intentional tort for wrongful eviction—shaped the analysis of whether or not the insured intended or expected harm of the same type as alleged in the underlying complaint. *See Knowles*, 832 P.2d at 398 ("[t]he requisite intent necessary for an intentional tort such as wrongful eviction is that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it" (internal citation and quotation marks omitted)).

Luckily, the New Mexico Supreme Court has since clarified the issue of how to analyze exclusionary clauses. In *Lopez v. New Mexico Public School Insurance Authority*, the court

explained that while policy exclusions are indeed narrowly construed, their applicability is based on the *acts underlying* the theory of recovery, not the legal elements of the claim for recovery itself. *See Lopez*, 870 P.2d at 747. In assessing whether the plaintiff's underlying civil rights complaint was based on excluded acts of sexual misconduct, the *Lopez* court looked not at the elements of a civil rights violation but at the underlying actions leading to the complaint, and explained that "[i]n determining the applicability of [an] exclusion, [the] focus must be on the *origin* of the damages, *not* the *legal theory* asserted for recovery." *Id.* (internal quotation omitted).

Here, *Lopez* applies to negate the Kelly's Defendants' argument that *Knowles* does not govern because the underlying legal theories of recovery do not carry an element requiring intent to harm. Instead, looking to the origin of the damages asserted in *Atyani* and *Frank*, the Court finds that the implementation of the "tip-out" policy requiring servers to pay the Kelly's Defendants some or all of their cash tips was an intentional act, and the Kelly's Defendants intended the same general type of outcome—taking the servers' tips—that allegedly harmed the servers. *See Knowles*, 832 P.2d at 398; *Lopez*, 870 P.2d at 747; *accord Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 864 F. Supp. 2d 1157, 1196–97 (D.N.M. 2012) (citing *Knowles* to hold that when a suit claimed property damage because defendants "enlarged the water diversion system and altered the flow of the water, diverting the water onto [the plaintiff's] property[,]" there was no policy coverage for the underlying complaint even though the *harm* caused by the diversion was not intentional. The defendants "may not have expected to flood [plaintiff's] property, but they intended to divert the water from the Brown Arroyo."). The Kelly's Defendants' arguments that there is no evidence they kept or intended to keep the tips for themselves are irrelevant in determining duty to defend—the relevant act is taking the servers' cash tips away from them, not whether they intended to harm the servers or actually benefitted themselves by doing so. (*See e.g.*,

Doc. 78 at 6.) Thus, finding no duty to defend under these facts is squarely in line with controlling New Mexico Supreme Court precedent in *Knowles* and *Lopez*.[8]

## III.    Duty to Indemnify

"If the allegations of the complaint clearly fall outside the provisions of the policy, neither defense nor indemnity is required." *Bernalillo Cty. Deputy Sheriffs Ass'n v. Cty. of Bernalillo*, 845 P.2d 789, 791 (N.M. 1992). Thus, as the Court has found that the Insurers do not have the broader duty to defend in the underlying *Atyani* and *Frank* state suits, they have no duty to indemnify the Kelly's Defendants for those claims either.

## IV.    The Kelly's Defendants' Counterclaim

Having determined that the Insurers have no duty to defend or indemnify the Kelly's Defendants in *Atyani* and *Frank*, the Court must determine whether the remaining allegations in the Kelly's Defendants' Counterclaim (Doc. 50) are properly resolved on a motion for summary judgment. The breach of contract claim (Count I) is based on the Insurers' refusal to defend and indemnify the Kelly's Defendants in the underlying lawsuits. (*Id.* at 17.) As the Court finds as a matter of law that the Insurers have no duty to defend or indemnify, it follows that the Insurers did not breach their contract with the Kelly's Defendants by declining to defend or indemnify them in the suits. Thus, the Court resolves Count I in favor of the Insurers.

The Insurers have moved for summary judgment as to *all* counts in the Kelly's Defendants' Counterclaim, while the Kelly's Defendants moved for summary judgment only on Count I. (*See* Docs. 74 at 1; 53 at 2.) Thus, the Court must decide if there is a genuine dispute as to any material

---

[8] The Kelly's Defendants also allege that the Insurers cannot rely on the provision in the policies excluding coverage for property damage to "personal property in the insured's care, custody or control" because they waived this defense by not including it in their denial letters. (*See* Docs. 53 at 18; 78 at 20–21.) Because the Court finds that the "expected or intended injury" exclusionary provision relieves the Insurers of their duty to defend, this Opinion will not address the issue of whether any additional defenses were waived.

fact regarding the Kelly's Defendants' claims of bad faith (Count II) and violations of the UIPA (Count III), viewing the facts in the light most favorable to the Kelly's Defendants as the nonmoving party. (*See id.*) The Insurers argue that the bad faith claim must fail as a matter of law because "[t]he concept of bad faith or failure to pay in the insurance context does not arise unless there is a contractual duty to pay under the policy." (Doc. 74 at 21 (citing *Charter Servs., Inc. v. Principal Mut. Life Ins. Co.*, 868 P.2d 1307, 1313 (N.M. Ct. App. 1994).) The Insurers further argue that the same is true for claims under the UIPA. (*Id.* at 22 (citing *N.Y. Life Ins. Co. v. Saul*, No. CV 17-621 KG/KK, 2017 WL 5634117, at *2 (D.N.M. Nov. 22, 2017)).)

In response, the Kelly's Defendants allege various specific facts supporting their bad faith and UIPA claims. (*See* Doc. 78 at 6–9.) The Kelly's Defendants do not, however, point to any caselaw suggesting that an insurance company can act in bad faith in denying a claim *even in the absence of a duty to defend or indemnify.* Each of the Kelly's Defendants' legal arguments in response to the Insurers' motion for summary judgment on the bad faith claim assert only that a duty to defend exists and the Insurers thus declined to defend in bad faith. (*See id.* at 22–23.) To the extent that the Kelly's Defendants argue that a bad faith claim can exist in regard to the sufficiency of the investigation leading up to the denial of defense, even if the denial was correct, they have not pointed to New Mexico caselaw supporting such an argument. To the contrary, a 2006 decision in this District explicitly held the opposite:

> According to [the insured], even though the Policy did not provide coverage . . . , Allstate could still be held liable for a bad faith claim if their investigation was not sufficient to make that determination. This Court rejects this argument. Allstate cannot be held liable to its insured for bad faith, even if Allstate's investigation were inadequate, where Allstate correctly concluded that the Policy did not afford coverage for the loss. *See Charter Services*, 117 N.M. at 88, 868 P.2d at 1313 ("Because Defendant was not contractually obligated to pay under the policy, it follows that Plaintiff cannot prevail on its claim that Defendant acted in bad faith by denying [his] claim without adequate investigation. The policy did not provide coverage for [his] injuries.").

*Allstate Ins. Co. v. Ford Motor Credit Co.*, No. CV 04-1285 MCA/WPL, 2006 WL 8444371, at

*4 (D.N.M. Mar. 7, 2006), *aff'd*, 236 F. App'x 405 (10th Cir. 2007). The Court agrees, and finds

that, as the Insurers had no duty to defend in the underlying lawsuits, they could not have acted in

bad faith in reaching that decision. The Court will resolve Count II in favor of the Insurers.

The Kelly's Defendants do, however, allege various facts that appear to support a claim

under the UIPA. Their list of "Additional Facts Precluding Summary Judgment" allege that: the

Insurers waited a year to file the declaratory action after first denying coverage; Peerless Insurance

Company never issued a denial letter; the Insurers' claims specialists made no effort to determine

whether the underlying complaints might actually fall within policy coverage under New Mexico

law; the underlying class action complaints should have been referred to the Insurers' corporate

office but were not; claims specialists did not speak with the Kelly's Defendants before denying

coverage; claims specialists failed to sufficiently investigate the claims; and claims specialists

failed to comply with industry standards. (Doc. 78 at 6–9.) The Kelly's Defendants also produced

an expert report on industry practice for insurance claims professionals to support their factual

assertions (*see* Doc. 78-9), and have supplemented the record with deposition testimony from

several of the Insurers' claims specialists describing how they handled the claims (*see* Doc. 77).

The Kelly's Defendants then argue that the facts described above provide a basis for their

claim that the Insurers violated the UIPA, NMSA 1978, § 59A-16-20, because the facts

demonstrate "a failure to acknowledge and act promptly with respect to the claims, a failure to

adopt and implement reasonable standards for claim handling, a failure to act in good faith, and a

failure to promptly provide a reasonable explanation for denials of coverage." (Doc. 78 at 23.) The

Kelly's Defendants argue that "Peerless's failure to send any denial letter until filing suit over a

year after being notified of the suit is by itself sufficient to deny summary judgment on these counterclaims." (*Id.*)

The Insurers dispute most of the Kelly's Defendants' additional facts, taking particular issue with their characterization of the record and the testimony of claims specialists. (*See* Doc. 86 at 3–6.) The Insurers argue that the Kelly's Defendants' "expert does not identify industry publications or the like setting out the standards that they claim are accepted industry standards[,]" and offer a report from their own expert opining that the Insurers did *not* violate industry standards. (*Id.* at 5–6; Doc. 86-3.) The Insurers do not, however, point to a lack of genuine dispute as to facts material to the UIPA claim, nor point to any cases showing, as a matter of law, that the Kelly's Defendants cannot pursue a claim for UIPA violations if the Insurers had no duty to defend the underlying lawsuits. Though the Insurers imply that *New York Life Insurance Company* stands for this proposition (*see* Doc. 74 at 22), a closer reading reveals that the case simply holds that a lack of duty to defend would necessarily moot "*a generalized claim of 'bad faith'* for Unfair Claims Practices" as defined in the UIPA. *See* 2017 WL 5634117, at *2 (emphasis added).

The Counterclaim alleges specific violations of the UIPA beyond a generalized claim of bad faith, including that the Insurers failed to acknowledge and act promptly on communications, failed to adopt and implement reasonable standards, and failed to provide a reasonable explanation of the basis relied upon for denying defense. (*See* Doc. 50 at 20.) When faced with a motion for summary judgment, the Kelly's Defendants met their burden by laying out additional facts in support of their claims, numerous citations to the record, deposition testimony, and an expert report. (*See* Docs. 78 at 6–9; 78-1 through 78-9.) Viewing the facts in the light most favorable to the nonmovant, there appears to be a genuine factual dispute, at the very least, as to whether the Insurers sufficiently investigated claims, communicated with policyholders, and implemented

reasonable standards for handling claims. (*See id.*; Doc. 86 at 2–6.) To the extent that the Insurers argue the UIPA allegations do not meet the *Twombly/Iqbal* pleading standard (*see* Doc. 86 at 12), the Court is not persuaded of this and is unwilling to entertain such arguments since the Insurers chose not to file a motion to dismiss asserting those claims in full. Finally, the Court declines to determine as a matter of law whether punitive damages are potentially available under the UIPA claim. (*See* Doc. 74 at 25–26.)

**THEREFORE,**

**IT IS ORDERED** that the Insurers' Motion for Summary Judgment (Doc. 74) is **GRANTED IN PART** as to their duty to defend and indemnify the underlying lawsuits; **GRANTED IN PART** as to the Kelly's Defendants' breach of contract and bad faith claims; and **DENIED** as to the Kelly's Defendants' claim for violations of the UIPA and any potential punitive damages arising out of that claim;

**IT IS FURTHER ORDERED** that Defendants Dennis Bonfantine, Janice Bonfantine, D.B. Kelly, Inc., d/b/a Kelly's Brew Pub and Restaurant and DB Brewery LLC's Motion for Partial Summary Judgment (Doc. 53) is **DENIED**;

**IT IS FURTHER ORDERED** that West American Insurance Company and Peerless Indemnity Insurance Company have no duty to defend or indemnify the Kelly's Defendants in the underlying lawsuits.

_____
**ROBERT C. BRACK**
**SENIOR UNITED STATES DISTRICT JUDGE**